IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02309-KLM

TERRI P. BENNETT,

      Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security[1],

      Defendant.

---

## ORDER VACATING AND REMANDING DECISION
## OF THE COMMISSIONER OF SOCIAL SECURITY

---

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

    This matter is before the Court[2] on the **Social Security Administrative Record** [#11][3], filed September 24, 2018.  The Complaint [#2] seeks review of the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits pursuant to Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401, *et seq.*  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).

---

[1] On June 17, 2019, Andrew M. Saul was sworn in as the Commissioner of the Social Security Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill, former Acting Commissioner of Social Security, as the Defendant in this case.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The parties consented to proceed before the undersigned for all proceedings pursuant to 28 U.S.C. § 636(d) and D.C.COLO.LCivR 72.2.  *See* [#20], [#24].

[3] "[#11]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this Order.

The Court has reviewed Plaintiff's Opening Brief [#21] (the "Brief"), Defendant's Response Brief [#22] ("Response"), Plaintiff's Reply Brief [#23] ("Reply"), the entire case file and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the decision of the Commissioner is **REVERSED** and **REMANDED** for further fact finding.

## I. Factual and Procedural Background

Plaintiff was born on August 18, 1956, and filed a claim for Disability Insurance Benefits under Title II of the Act on August 11, 2014. Transcript ("Tr.") [#11] at 44. Plaintiff alleged disability beginning January 24, 2010, from cervical spine injury, post traumatic stress disorder ("PTSD"), depression, memory loss/confusion from mild traumatic brain injury, and cervical radiculopathy. *Id.* 44, 244. The disability records also indicate that Plaintiff suffered from agoraphobia. *See, e.g.,* 50.

Plaintiff's claim was initially denied on December 3, 2014, Tr. 214, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* 96-97. ALJ Katheryn D. Burgchardt held a hearing on July 16, 2015. *Id.* 336-80. On July 27, 2015, ALJ Burgchardt issued an unfavorable decision, finding that Plaintiff had not been disabled from the date of the onset of disability through her last insured date. *Id.* 56-70. Plaintiff a "Request for Review of Hearing Decision" with the Appeals Council, which was denied on September 20, 2016. *Id.* 76-79, 150-151.

Plaintiff then filed this action. At the Commissioner's request, on July 22, 2016, District Judge Robert E. Blackburn remanded the matter to the Commissioner pursuant to sentence six of 42 U.S.C. §405(g) for the taking of additional evidence. Tr. 85-86. On April

20, 2016, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ. *Id.* 87-91. The Appeals Council ordered that the ALJ "obtain additional evidence concerning the claimant's mental and physical impairments," "give additional consideration to the [medical] source opinions . . . and explain the weight given to such opinion evidence[,]" "request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinion" if appropriate, further evaluate Plaintiff's mental impairments, and give further consideration to Plaintiff's maximum RFC, providing "appropriate rationale with specific references to evidence of record in support of the assessed limitations[.]" *Id.* at 89-90.

After the remand, a hearing was held before ALJ Burgchardt on September 22, 2016. Tr. 24-42. On November 25, 2016, the ALJ again issued an unfavorable decision. *Id.* 1-15. Plaintiff did not file exceptions with the Appeals Council, and the Appeals Council did not assume jurisdiction *sua sponte*, rendering this second decision of the ALJ the Commissioner's final decision for purposes of this Court's review. *See* 20 C.F.R. § 404.984(d).

## II. The Hearing Testimony

At the initial hearing in July 2015, Plaintiff was asked about and testified regarding the 2010-2011 period. Plaintiff testified that she lived with her husband except that when he was deployed, one of her sons stayed with her. Tr. 342. As to her daily activities, Plaintiff testified that her family would have meals together and go for walks, and Plaintiff would read, watch television, and perform exercises at home recommended by her physical therapist. *Id.* 345-46. Plaintiff did small loads of laundry, light cleaning, and used the

dishwasher, but did not go grocery shopping, do heavy cleaning, or yard work. *Id.* 355-357. Plaintiff did minimal driving, and did not use the stove unless someone was at home because she sometimes forgot she was cooking and burned the food. *Id.* 345, 356.

Plaintiff testified that she felt better when her husband was at home, and she spent most of her time with him. Tr. 359. Plaintiff said that would have good days and bad days. *Id.* 361. She did not answer the phone or the door, and gave an example of a bad day as one where the phone rang a lot or the doorbell rang, and Plaintiff would panic and feel like someone was insistent on getting into the house. *Id.* On that type of day, Plaintiff said that she would contact her husband or one of her sons to come to the house. *Id.* Plaintiff said that she occasionally would leave the house alone because her therapist had instructed her to "take baby steps." *Id.* 360. According to Plaintiff, she would feel better and drive somewhere by herself, and then would have an experience that would trigger her anxiety causing her to be unable to get home. *Id.* 359-361.

Plaintiff said that her mental health problems had been going on since before 2010, but that they got worse in 2010. Tr. 362-363. The biggest reason she was unable to work, according to Plaintiff, was her anxiety and PTSD which keep her from driving and from answering the phone and the door. *Id.* 363. Plaintiff also testified that she had a lot of problems with short-term memory. *Id.* 367. She said her husband made lists, but she sometimes had trouble following them because she could not recall the conversation that led to the list entry. *Id.*

Plaintiff testified that after a November 2010 car accident, her pain on a bad day was about a six to an eight on a scale of one to ten. Tr. 364-365. Plaintiff averred that she

could not concentrate on bad pain days, and could only use a computer for small amounts of time because she could not turn her head or hold her head in one place for long. *Id.* 365. She also had problems using the keyboard because some of her fingers on her left hand would go numb for several hours at a time. *Id.* 365-366. Plaintiff took medication but it did not alleviate all of the pain. *Id.* Plaintiff also said that she had balance issues after her November 2010 accident. *Id.* 366.

At the September 2016 followup hearing, Plaintiff read a statement she had prepared about her status since the last hearing. Tr. 32. Plaintiff said that she continued to have problems with major depression and agoraphobia, and had twice been an in-patient at Highlands Behavioral Health. *Id.* 33. According to Plaintiff, the agoraphobia and PTSD had steadily worsened since 2009. *Id.*

Plaintiff further testified that beginning in 2009, she had difficulty leaving the house and going to public places, and also "understanding and reading people" so she did not see friends or relatives. Tr. 34. She could not leave the house, talk on the phone, or answer the door. *Id.* Plaintiff stated that her short-term memory had worsened. *Id.* Further, Plaintiff said she had problems with her neck and left arm, including difficulty lifting or carrying anything over five pounds, and had experienced radiculopathy in those areas since 2002. *Id.* 35. Plaintiff testified that her overall body strength had weakened. *Id.*

Plaintiff also stated that she had essentially not driven since she totaled her car in November 2010. Tr. 35. She had tried again a few times in 2014 at the urging of her therapist, but had stopped after a number of close calls and a panic attack. *Id.* Plaintiff testified that she had been told by "Dr. Rachel" that her PTSD was cumulative, and that her

accident in 2010 probably added to her anxiety and PTSD.  *Id.*

In response to questioning from her attorney, Plaintiff said that she did not have more treatment in the time between the alleged onset date and the date last insured because her husband was deployed.  Especially after November 2010, Plaintiff testified that she could not leave the house by herself or drive, and had a cast on her foot so she did not go to physical therapy, but sometimes had mental health therapy sessions over the phone. Tr. 36.  Plaintiff said that her treatment provider, Rebecca Albright, was familiar with her mental condition in 2010 and 2011, because Plaintiff started treatment with her in 2007 and continued until sometime in 2011.  *Id.*  Plaintiff also stated that the nature of her difficulties had not changed since 2010 and 2011, and that she still had PTSD and severe anxiety around people with difficulty reading them.  *Id.* 37.  She never left the house without her husband, *id.* at 37, 34, and Plaintiff said that her husband retired early from his job so that he could get her to appointments.  *Id.* 33.

### III.  The ALJ's Decision

In the sequential evaluation process required by law, the ALJ found at step one that Plaintiff last met the insured status requirements of the Act on March 31, 2011.  Tr. 7.  The ALJ further found that Plaintiff had not engaged in substantial gainful activity during the period from her onset date of January 27, 2010, through her date last insured of March 11, 2011.  *Id.*

At step two, the ALJ found through the date last insured that Plaintiff had severe impairments of "degenerative disc disease of the cervical and lumbar spine; depressive disorder; anxiety disorder; and mild traumatic brain injury."  Tr. 7.  The ALJ stated that her

finding of severe mental impairments was the result of giving Plaintiff "a great benefit of the doubt." *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments, including Listings 12.02, 12.04 and 12.06. *Id.* at 7-8.

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found through the date last insured that Plaintiff could "perform a range of light work as defined in 20 CFR 404.1567(b)" with certain restrictions. Tr. 9. Specifically, the ALJ found:

> The claimant was able to lift or carry 10 pounds frequently and 20 pounds occasionally. She could stand or walk a total of six hours, and sit a total of six hours, in an eight-hour workday with normal breaks. She should perform pushing and pulling motions with her upper and lower extremities within the aforementioned weight restrictions. She could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, stoop and crouch. She could frequently balance, kneel and crawl. She could occasionally reach overhead bilaterally. The claimant required unskilled work, with an SVP of 2 or less, not in close proximity to co-workers or supervisors (meaning the claimant could not function as a member of a team), and minimal to no direct contact with the public.

*Id.*

The ALJ stated that "[s]ocial security regulations require substantial impairment for individuals under age 55[,]" and that Plaintiff "was only 54 years old on the date last insured." Tr. 13. The ALJ further stated, "[a]lthough she is older now and has possibly deteriorated, how the claimant is functioning in 2016 cannot be a basis for a finding of total disability prior to the date last insured of March 31, 2011." *Id.*

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant skilled work because it exceeded the RFC. Tr. 13-14. At step five, the ALJ found, taking into account Plaintiff's age, education, work experience, RFC, and testimony from

a vocational expert, that there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed during the relevant time period. *Id.* 14. These jobs included Shelving Clerk, Photocopy Machine Operator, and Collator Operator. *Id.* 15-16. Accordingly, the ALJ found that Plaintiff was not under a disability "at any time from January 27, 2010, the alleged onset date, through March 11, 2011, the date last insured." *Id.* 16.

Plaintiff did not file exceptions with the Appeals Council, and the Appeals Council did not assume jurisdiction *sua sponte*. The ALJ's decision thus became the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 404.984(d).

## IV. Standard of Review and Applicable Law

Pursuant to the Act:

> [T]he Social Security Administration is authorized to pay disability insurance benefits and Supplemental Security Income to persons who have a "disability." A person qualifies as disabled, and thereby eligible for such benefits, "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

*Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)). Under the applicable legal standard, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009). The existence of a qualifying

disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings.  42 U.S.C. §§ 423(d)(3), 423(d)(5)(A).

"When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination."  *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).  However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Act.  To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months.  *See Kelley v. Chater,* 62 F.3d 335, 338 (10th Cir. 1995).

The Court reviews a final decision by the Commissioner by examining the administrative record and determining "whether the [ALJ's] factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied."  *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010).  Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"Evidence is not substantial if it is overwhelmed by other evidence or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  In other words, the Court's determination of whether the ALJ has supported his or her ruling with substantial evidence "must be based upon the record taken as a whole."  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  In addition, "if the ALJ failed to apply the

correct legal test, there is a ground for reversal apart from a lack of substantial evidence."
*Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

A court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. However, it "may not reweigh the evidence nor substitute [its] judgment" for the Commissioner's. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). In other words, the Court does not reexamine the issues *de novo. Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F. 3d 739, 741 (10th Cir. 1993). Thus, even when some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court may have "made a different choice had the matter been before it *de novo.*" *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

## V. Analysis

Plaintiff asserts that the ALJ erred at step three of the sequential evaluation in connection with her mental impairments. *Brief* [#21], at 31-37. She also asserts that the ALJ erred in the RFC in not properly assessing her pain and credibility, developing the record, or properly weighing the opinions of the treating sources. *Id.* at 38-44. Finally, Plaintiff argues that the ALJ erred at step five by not properly considering the impact of Plaintiff's age. *Id.* at 44-46. The Court addresses each argument in turn.

## A. Step Three

At step three of the ALJ's decision, Plaintiff argues that the ALJ erred by not finding that she met or medically equaled the requirements of Listings 12.04 (affective disorders)

and 12.06 (anxiety disorders), as there is substantial evidence that Plaintiff meets the requirements of these Listings. *Brief* [#21] at 31-32. During the relevant time period[4], Listing 12.04 required Paragraphs A and B to both be satisfied <u>or</u> for Paragraph C to be satisfied. Similarly, Listing 12.06 required Paragraphs A and B to both be satisfied <u>or</u> for Paragraph C to be satisfied. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06. The ALJ analyzed only Paragraphs B and C of the Listings, finding that Plaintiff neither met nor medically equaled either Paragraph. Tr. 7-9.

"'At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges as so severe as to preclude substantial gainful activity.'" *Drapeau v. Massanari*, 255 F.3d 1211, 1212 (10th Cir. 2001) (citation omitted). The claimant must point to "medical findings" that support a finding that a listing is met; "the claimant's descriptions, alone, are not enough to establish a physical or mental impairment." *Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir. 1988). The impairments "must meet all of the specified medical criteria" of the listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The Court first addresses Paragraph A of Listing 12.04. As relevant here and at the time at issue, Paragraph A stated that Plaintiff must show "[m]edically documented persistence, either continuous or intermittent, of . . . [d]epressive syndrome, characterized by at least four of the following:

---

[4] The parties agree that the version of the Listings effective prior to January 17, 2017, is the appropriate version to use for resolution of this issue. *Brief* [#21] at 32 n.1; *Response* [#22] at 8 n.3. The Court thus refers to that version as set forth in the Brief [#21]. *Id.* at 32-36.

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

Plaintiff asserts that the requirements of Paragraph A are met as a result of a depression screening conducted on January 28, 2010, the day after the alleged onset date. This screening diagnosed Plaintiff with depression and reported that Plaintiff suffered "more than half the days" from "little interest or pleasure doing things" (*see* Paragraph 1(a) above), "trouble falling or staying asleep, or sleeping too much" (*see* 1(c)), "feeling bad about yourself or that you are a failure or have let yourself or your family down" (*see* 1(f)); "feeling tired or having little energy" (*see* 1(e)), and "trouble concentrating" (*see* 1(g)).  Tr. 883-85.  The screening also reported that "more than half the days" Plaintiff felt "down, depressed or hopeless[,]" and that on "several days" Plaintiff thought she would be better off dead or hurting herself in some way.  *Id.* at 884-85.

The ALJ did not discuss Paragraph A or the evidence that Plaintiff relies upon.  The Court finds from the screening and its reference to Plaintiff having the symptoms "more

than half the days" that Plaintiff may meet or equal the requirements of Paragraph A (depressive syndrome characterized by at least four of the listed symptoms). The Commissioner did not address or contest this in its Response [#22]. Accordingly, the Court finds that the ALJ erred as to this issue. However, as Defendant notes, in order to meet the requirements of Listings 12.04 and 12.06, Plaintiff must also demonstrate that her conditions meet either the Paragraph B or the Paragraph C criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06. If Plaintiff cannot show that she meets the requirements of either Paragraphs B or C, any error in regard to Paragraph A would be harmless. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005). Thus, the Court turns to Plaintiff's argument that the ALJ erred in her findings as to Paragraphs B and C.

To meet the requirements of Paragraph B for Listings 12.04 and 12.06, Plaintiff was required to show that her symptoms resulted in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

The ALJ found that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining concentration, persistence and pace; moderate difficulties in social functioning; and no episodes of decompensation that were of extended duration. Tr. 8.

Plaintiff argues that the ALJ provided very little evidence to support her findings as to Paragraph B, and that the findings are not supported by substantial evidence. Tr. 33-34. Plaintiff avers that the ALJ merely states reasons for her findings based on unsupported

inferences and doubts as to the evidence. *Id.* at 34. The Court agrees with Plaintiff that the ALJ's analysis of whether Paragraph B was met, and the ALJ's findings as to Paragraph B, are not supported by substantial evidence.

The Court first notes that the ALJ did not appear to rely on any medical opinion to support her findings at step three and as to Paragraph B, as she gave "little weight" to the only opinions in the record regarding Plaintiff's mental impairments. Tr. 12. Moreover, the ALJ chose not to order a consultative psychological examination to determine the extent of Plaintiff's limitations from her mental impairments, despite the Appeals Council's Order indicating that the ALJ was "to obtain additional evidence concerning the claimant's mental and physical impairments in order to complete the administrative record," including consultative psychiatric examinations if appropriate. *Id.* 88. The Court further finds that the ALJ relied on improper grounds that do not constitute substantial evidence to support her decision at step three, and that the ALJ's findings at step three regarding Paragraph B are thus unsupported.

Thus, the ALJ first stated that the "allegedly limited daily activities and social interactions [of Plaintiff] cannot be objectively verified with any reasonable degree of certainty." Tr. 8. However, the medical evidence documents agoraphobia and panic disorder as well as related symptoms, including Plaintiff's inability to leave her home from as early as 2008 and during the relevant time period. *See* Disability Determination Explanation at Tr. 50-51 (discussing the medical evidence), Tr. 464-64, 467, 487, 492, 598, 834, 848, 851, 883-85. Further, the depression screening in the record documents Plaintiff's lack of interest in doing things. *Id.* 884-85. This evidence provides objective verification in

support of Plaintiff's assertion of limited social interactions and activities. Plaintiff's assertion was also corroborated by the Third Party Adult Function Report prepared by Plaintiff's husband. *Id.* 255-56. The Court agrees with Plaintiff that the ALJ's decision to discredit her reports of limited daily activities for a lack of "objective verification" is unreasonable in light of the evidence in the record, and therefore does not constitute substantial evidence to support the ALJ's findings.

Second, the ALJ stated that "even if the claimant's daily activities and social interactions were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's mental condition, as opposed to other reasons, including no clear diagnosis of a mental impairment by an acceptable medical source." Tr. 8. The ALJ did not state, however, what "other reasons" existed for the limitation in Plaintiff's daily activities and social interactions; hence this was an improper "bare conclusion[.]" *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

This finding also appears to improperly discount the step three finding that Plaintiff had severe mental impairments including depressive disorder and an anxiety disorder. Tr. 7. These impairments were found despite the ALJ's belief that the record did not contain a mental health diagnosis by an acceptable medical source. Moreover, there was such a diagnosis in the record, albeit a retrospective one. *Id.* 1076, 1110 (opinion by Dr. Lentz diagnosing PTSD since 2009). *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348 (10th Cir. 1990) (retrospective diagnosis of physician is appropriate so long as there is evidence of actual disability during relevant period). Dr. Lentz's diagnosis is supported by the medical records and opinions diagnosing numerous mental impairments

by providers who were not acceptable medical sources, including the opinion of treating provider Rebecca Albright, MSW, LCSW (Tr. 1071), who treated Plaintiff during the applicable period and whose opinion the ALJ gave little weight to.[5]  This medical evidence was entitled to consideration by the ALJ, even if it was not issued by an acceptable medical source, particularly given the diagnosis by Dr. Lentz and the ALJ's finding of severe impairments.  *See* SSR 06-03p, 2006 WL 2329939, at **2-4 (2006) ("information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function").  Accordingly, the second reason given by the ALJ to find that Plaintiff did not meet the requirements of Paragraph B is also not supported by substantial evidence.

Third, the ALJ stated that "the limited objective evidence pertaining to the claimant's mental functioning during the period under review reflects unimpaired memory and shows no indication of cognitive dysfunction."  Tr. 8 (citing Ex. 14F/108, 112.)  The ALJ further stated that, "[o]verall, the claimant's reports are not substantiated by medical evidence."  *Id.*  The Court finds that the ALJ improperly selectively applied the evidence, as the evidence documented issues relevant to Plaintiff's mental impairments which the ALJ did not discuss or acknowledge.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (the ALJ may not "'pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence. . . .'") (citation omitted).

---

[5] The ALJ's weighing of Ms. Albright's opinion and whether she erred in that regard is discussed in Section V.B, *infra*.

As support for her third finding the ALJ referred to page 108 of Exhibit 14F (Tr. 851), a record from a medical provider made shortly after Plaintiff's November 2010 car accident. While the record notes no memory impairments at that time, it documents that Plaintiff has adjustment disorder with anxious mood. The record also stated that Plaintiff was seeing a therapist for anxiety, and that she needed help with the anxiety because her therapist was out of town. *Id.* The second record the ALJ relies on, page 112 of Exhibit 14F (Tr. 855), is a screening for post concussive syndrome after the car accident. While the record noted that memory was unimpaired, mental status was normal, and that thought processes and content were not impaired, it also stated that Plaintiff's mood was depressed. *Id.* Moreover, in another record from that same visit, the provider noted that Plaintiff was tearful and that she was in therapy and being treated for insomnia and depression. *Id.* 853. The ALJ did not discuss these additional findings that provided support for Plaintiff's mental impairments. The ALJ also referred to an MRI that "revealed no acute findings or clear explanation for the claimant's reported post-concussive syndrome symptoms." *Id.* 9. An MRI is, however, irrelevant to the issue of depression or anxiety, as it does not screen for those issues.

The Court also notes that the records relied on by the ALJ did not contain a functional assessment of Plaintiff's mental impairments. In contrast, there are opinions in the record which did provide such assessments that the ALJ chose to give little weight to. Tr. 1071-74, 1109-10. There were also other medical records documenting Plaintiff's symptoms that the ALJ failed to adequately consider. *See, e.g.*, 492 (diagnosing Panic Disorder with Agoraphobia and noting increased anxiety and depressive symptoms; depressed, fearful, and anxious mood; tearful affect with fright and worry; suicidal ideation; anhedonic pleasure

level assessment; anergic energy level), 834 (finding adjustment disorder" with depressed and anxious mood, panic disorder with agoraphobia, and depression), 966 (noting high anxiety, panic attacks, and agoraphobia, and that Plaintiff "will not leave home by herself").

From the foregoing, the Court finds that there is not substantial evidence to support the ALJ's findings regarding Paragraph B. As the ALJ erred in regard to the findings as to both Paragraphs A and B, the case must be remanded to the ALJ for further factfinding as to whether Plaintiff is disabled at step three under these paragraphs of Listings 12.04 and 12.06.

The Court also finds that a remand is appropriate for the ALJ to properly consider whether Plaintiff meets Paragraph C of Listings 12.04 and 12.06. The ALJ found that Plaintiff did not meet the requirements of this paragraph because she "did not have a history of one or more years of inability to function outside a highly supportive living arrangement" or the "complete inability to function independently outside her home." Tr. 8-9. Plaintiff asserts that the evidence of agoraphobia discussed previously, and which is undisputed, shows that she was unable to function outside a highly supportive living arrangement (her home) during the relevant time period. *Brief* [#21] at 37.

Turning to the Court's analysis of that issue, 20 C.F.R. 404, Subpt. P, App. 1, § 12.00, Paragraph F explains the effects of structured settings as set forth in Listing 12.04C and 12.06C. It states that a highly structured and supportive setting may be found in the claimant's home, and notes that the paragraph C criterion of 12.06 reflects the uniqueness of agoraphobia, an anxiety disorder manifested by an overwhelming fear of leaving the home. The ALJ did not discuss this or provide any basis to support her decision regarding

Paragraph C, and the ALJ's findings on this issue are thus not supported by substantial evidence. *See Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate language, unconnected to any evidence in the record will not suffice to support an ALJ's conclusion).

Finally, at the conclusion of the ALJ's step three findings, the ALJ noted that Plaintiff complained of "quite limited" social interactions and daily activities. Tr. 9. While the ALJ found that "several factors weigh against considering these allegations to be strong evidence in favor of finding her disabled[,]" she did not state how this impacted her findings at step three and, specifically, her finding that Plaintiff had only mild to moderate difficulties as to the criteria of Paragraph B. The Court finds that this is also error.[6]

The ALJ's errors at step three of the analysis constitute reversible error, as "there are no findings that 'conclusively negate the possibility'" that Plaintiff can meet the relevant listings. *Gorelick v. Berryhill*, 383 F. App'x 700, 702-03 (10th Cir. 2010). This case must thus be remanded for a redetermination of whether Plaintiff is disabled at step three due to her mental impairments.

**B.      The Weighing and Assessment of the Medical Opinions**

The Court also finds that the ALJ erred in weighing the medical opinions of Dr. Rachel Lentz and Ms. Albright. The ALJ did not give good, legitimate reasons for giving their opinions little weight. *See Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).

---

[6] The credibility assessment made by the ALJ in this portion of her step three finding is addressed in Section V.C, *infra*.

The Court first notes that Dr. Lentz was a treating psychologist. The ALJ was thus required to conduct a "sequential two-step inquiry" as to Dr. Lentz's opinion, "each step of which is analytically distinct." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). "The initial determination the ALJ must make with respect to a treating physician's opinion is whether it is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates." *Id.* (citation omitted). The opinion "must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* "If the opinion is deficient in either of these respects, it is not to be given controlling weight." *Id.* That does not, however, end the inquiry. "Even if a treating opinion is not given controlling weight, it is still entitled to deference; at the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Id.*[7] If this is not done, a remand is required. *Id.*

As to Ms. Albright, although she is not an acceptable medical source as defined in the regulations, "'[o]pinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.'" *Frantz v. Astrue*, 509 F.3d 1299, 1302 (quoting SSR

---

[7] The regulatory factors are: "'(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.'" *Watkins*, 350 F.3d at 1301 (citation omitted).

06-3p at *3).  The factors relevant to weighing the opinions of acceptable medical sources also apply to medical providers who are not acceptable medical sources.  *Id.*

The Court finds that the ALJ did not comply with the above standards.  The ALJ did not apply the required two-step analysis to determine whether Dr. Lentz's opinion was entitled to controlling weight or deference, and did not address the applicable factors relevant to deciding what weight to give either Dr. Lentz's or Ms. Albright's opinions.  The Court also finds that the reasons given by the ALJ to give "little weight" to the opinions of Dr. Lentz and Ms. Albright are not supported by substantial evidence.

The ALJ first stated that she gave little weight to the 2015 opinions of Dr. Lentz and Ms. Albright because "the temporal remoteness" of their statements "undercuts the statements' reliability as to the claimant's functional capacity during the period under review."  Tr. 12.  The ALJ failed to discuss the fact, however, that Ms. Albright actually treated Plaintiff during the relevant period (*id.* 37, 980) ,and that Ms. Albright explained the basis for her finding that the assessed limitations of Plaintiff applied during that period.  *See id.* 1071, 1073.  Further, the ALJ stated that Dr. Lentz began her treatment of Plaintiff in January 2011, which was also during the applicable time period.  *Id.* 29.[8]  The treatment of Plaintiff in 2010 and 2011 by Ms. Albright and Dr. Lentz undermines the ALJ's finding that their opinions were unreliable because of the temporal remoteness, particularly given the ALJ's failure to acknowledge or discuss the relevance of this fact.  Moreover, the ALJ's

---

[8] The Commissioner asserts, on the other hand, that Dr. Lentz did not begin treating Plaintiff until 2015.  *Response* [#22] at 19.  Because the record was not developed on this issue, the Court defers to the ALJ's statement for purposes of this Order.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (the ALJ's decision must be evaluated "based solely on the reasons given stated in the decision.").

reliance on temporal remoteness to discount or reject the treating provider's opinions is problematic given the fact that there were no medical opinions during the relevant time period from which Plaintiff's RFC could be assessed.

The ALJ also found that the probative value of the opinions of Ms. Albright and Dr. Lentz was undermined because they failed to "set forth specific functional limitations." Tr. 12. This is incorrect, as both Ms. Albright and Dr. Lentz opined as to Plaintiff's specific functional limitations. Dr. Lentz stated specific functional limitations in a form dated May 12, 2016. *Id.* 1109-1110. Dr. Lentz found that Plaintiff had marked and extreme limitations in many areas, described the basis for her findings, and stated that the limitations begin in 2009. *Id.* The ALJ's failure to even acknowledge Dr. Lentz's functional analysis means that the ALJ erred in her duty to "consider the opinion of every medical source and provide specific, legitimate reasons for rejecting it." *Lauxman v. Astrue*, 321 F. App'x 766, 769 (10th Cir. 2009)*; see also* SSR 96-8p, 1996 WL 374184, at *7 (the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved").

Ms. Albright also filled out a form providing a function by function analysis, finding as did Dr. Lentz that Plaintiff had moderate to extreme limitations. Tr. 1071-73. While the ALJ first stated that Ms. Albright had not provided specific functional limitations (*id.* 12), the ALJ then inconsistently went on to acknowledge Ms. Albright's functional assessment. *Id.* 13. The ALJ appeared to reject them as she found that "these terms do not translate to specific vocationally relevant limitations." *Id.* However, as Plaintiff notes, those terms are *exactly* the terms set forth in the special technique in 20 C.F.R. §404.1520a(c)(4) to be used for

evaluating mental impairments. The Appeals Council directed the ALJ to "[f]urther evaluate the claimant's mental impairments in accordance with the special technique. . ., documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in §404.1520a(c)." Tr. 90. Moreover, the Tenth Circuit has held that a mental health provider's assessment using such terms is "crucial for purposes of the mental health assessment." *Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012).

In evaluating Ms. Albright and Dr. Lentz's opinions, the ALJ also appeared to rely heavily on a lack of objective evidence during the relevant time period. *See* Tr. 12 (stating that "there is scant medical evidence to support any vocationally relevant limitations" prior to Plaintiff's date last insured). However, as indicated previously, it appears that both providers (and certainly Ms. Albright) treated Plaintiff during the relevant period. Indeed, the ALJ acknowledged in the hearing that their opinions say "what they recall about the timeframe that I need to look at." *Id.* 38. The ALJ also acknowledged that she needed to look at the medical notations contemporaneous" with the relevant time frame, and that she did not have them. *Id.* 28-29. And Plaintiff testified that there should be treatment records of Ms. Albright in 2010 and 2011. *Id.* 36. Yet there is no evidence that the ALJ sought to obtain this evidence from the treatment providers, even though the Appeals Council ordered the ALJ "to give additional consideration to the treating and non-treating source opinions" and, if appropriate, have them "provide additional evidence and/or further clarification of the opinion." *Id.* at 90. The Court finds that the ALJ was thus remiss in not developing the record as to this issue. *See Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) ("when

the ALJ considers an issue that is apparent from the record, he has a duty of inquiry and factual development with respect to that issue").

The ALJ also found that the opinions of Ms. Albright and Dr. Lentz were inconsistent with the "brief examinations" during the applicable time period "that generally reflect benign findings." Tr. 13 (citing Ex. 14F/112, 118, 130, 134, 143.) Again, the ALJ selectively applied the evidence. While there may be some benign findings, those records document Plaintiff's depression and anxiety, state that Plaintiff was seeking a counselor weekly for those mental impairments, and reference Plaintiff being overwhelmed, having a frustrated, depressed and unhappy mood, and thinking at times that she would be better off dead. *Id.* 855 (14F/111-12), 873 (14F/130), 877 (14F/134), 886 (14F/143). When the Court considers the other records that the ALJ did not discuss that also provided support for Plaintiff's mental impairments and agoraphobia, discussed in Section V.A, *supra*, it is plain that the ALJ erred in not conducting a proper and fair consideration of those impairments. It is also apparent that the ALJ's finding that the opinions of Ms. Albright and Dr. Lentz were inconsistent with the records reflecting generally benign findings is not supported by substantial evidence. This is further reinforced by the fact that the opinions of Ms. Albright and Dr. Lentz were supported by all the other medical providers' opinions in the record, including the opinions of Ms. Kryder (*id.* 997, 993, 994-96) and Ms. Hays (680-81), whose opinions the ALJ also gave "little weight" to. These opinions were thus uncontroverted.

The ALJ's decision to give little weight to all the mental health providers leaves the Court to question what the RFC assessment as to Plaintiff's mental impairments was based on. While an ALJ's RFC does not necessarily need to be based on a medical opinion, *see*

*Chapo,* 682 F.3d at 1288, the RFC must, nonetheless, be properly supported. *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Thus, the RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. Here, the ALJ did not state what specific evidence she relied on in assessing the mental RFC, or how that evidence supported that RFC assessment. Accordingly, the Court finds that the portion of the RFC assessing Plaintiff's mental impairments is not based on substantial evidence.

The errors in properly weighing the opinions of Ms. Albright and Dr. Lentz and in not developing the record, along with the ALJ's failure to adequately document what the mental RFC assessment was based on, require a remand for further fact finding on these issues.

## C.     The Pain and Credibility Assessment[9]

Plaintiff also argues that the ALJ erred in assessing Plaintiff's pain and credibility. *Brief* [#21] at 41-42.[10] The ALJ found that while Plaintiff's "medically determinable impairments could be expected to cause the alleged symptoms; . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. . . ." Tr. 10. As to pain, the ALJ acknowledged that "the evidence reflects complaints of chronic neck

---

[9] As the Commissioner notes, *Response* [#22] at 12 n. 4, effective March 28, 2016, SSR 16-3p eliminated the term "credibility" from the agency's sub-regulatory policy. 2016 WL 1237954. However, cases interpreting the regulations on which SSR 16-3p is premised, 20 C.F.R. §§ 404.1529 and 416.929, remain applicable to the evaluation of a claimant's subjective reports of her symptoms.

[10] The Court addresses pain and credibility together as they are intertwined.

pain," but found that "the evidence does not substantiate an assessment of more restrictive limitations than set forth in the assessed residual functional capacity." *Id.*

Turning to the Court's analysis, "'[c]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec. of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Kepler*, 69 F.3d at 391 (citations omitted).

As to pain, there is a three-step inquiry which requires consideration of (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, the claimant's pain is disabling. *Musgrave*, 966 F.2d at 1376; *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987). At the third step, in evaluating a claimant's subjective complaints of pain consideration should be given to such factors as "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991).

The Court finds that the ALJ erred with regard to her pain analysis. It is undisputed that Plaintiff suffered from a pain-producing impairment that was supported by objective medical evidence, and that there is loose nexus between that impairment and Plaintiff's subjective allegations of pain. As noted by the Commissioner, "Plaintiff had longstanding complaints of pain in her neck and lower back (lumbar spine)", and "Magnetic resonance imaging (MRI) studies from as early as 2002 showed narrowing (stenosis) of the spinal canal and the nerve root openings (neural foramina) in her lower back, but no degenerative changes in her neck." *Response* [#22] at 2-3; *see also* Tr. 11 (ALJ's statement that "the evidence reflects complaints of chronic neck pain," and discussing findings in diagnostic tests). Thus, the ALJ was required to consider all of the relevant evidence in determining whether Plaintiff was disabled by pain. *Luna*, 834 F.2d at 163. Only after this analysis could the ALJ decide whether she "believes the claimant's assertions of severe pain." *Id.*

The ALJ referenced the pain analysis only in a cursory fashion. Tr. 9-10. The ALJ examined some of the objective medical evidence, a task that falls within *Luna*'s first step, highlighted various normal findings, and discussed purported inconsistencies to find that Plaintiff was not fully credible about her pain symptoms. *Id.* 10-13. However, the ALJ did not make clear that she went on to the second two steps in *Luna* or that she considered the relevant factors, as required, which was error. *See Brownrigg v. Berryhill*, 688 F. App'x 542, 546 (10th Cir. 2017).

Moreover, the ALJ found that Plaintiff's complaints were not entirely credible based largely on the objective medical evidence. Tr. 10. However, "a lack of objective corroboration of the pain's severity cannot justify disregarding" a claimant's subjective

allegations of pain, "because the severity of pain is inherently subjective." *Luna*, 834 F.2d at 165. The ALJ did not consider many of the other relevant factors, such as the repeated references in the record documenting Plaintiff's pain (*see, e.g.,* Tr. 847, 850-51, 881), the efforts Plaintiff made to seek relief from the pain, or the dosage or side effects of the numerous medications that Plaintiff was taking. *See Brownrigg*, 688 F. App'x at 546. While the ALJ need not consider the required factors "in a formalistic way, . . . the substance must be there." *Id*. The substance is not present here, as the ALJ gave largely boilerplate reasons for rejecting Plaintiff's complaints of pain and did not link her conclusions to the evidence. *See Carpenter*, 537 F.3d at 1268 (finding that the ALJ's purported pain analysis was "improper boilerplate because he merely recited the factors he was supposed to address and did not link his conclusions to the evidence or explain how Mrs. Carpenter's repeated attempts to find relief from pain, and all the drugs she has been prescribed for pain, resulted in a conclusion that she is unlimited in any regard by pain or the side effects from her pain medication").

The Court also finds that some of the reasons for rejecting Plaintiff's credibility were not supported by substantial evidence. For example, the ALJ gave "limited weight" to physical therapy notes which document Plaintiff's pain as well as moderate to severe functioning in certain areas. The ALJ stated that the limitations found in physical therapy were based on Plaintiff's subjective complaints and that the terms in which they were couched "were of limited probative value in the context of a function-by function analysis." Tr. 10.

Plaintiff is correct, however, that there is nothing in the physical therapy notes that indicate the findings were based merely on Plaintiff's subjective reports, and the clinical tests performed as a part of therapy document reduced range of motion and function and other abnormal results that support the limitations that were found. Tr. 594-596. Accordingly, the ALJ erred in finding that those limitations were based merely on Plaintiff's subjective reports. *See Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) (an ALJ may not reject medical reports "based on his own speculative conclusion that the report was based only on claimant's subjective complaints"). Also, the fact that the physical therapy records "do not equate to functionally specific terms[,]" Tr. 10, does not mitigate their value in determining the impact of Plaintiff's pain, and should still be considered in assessing Plaintiff's physical limitations in connection with the RFC.

Further as to credibility, the ALJ appeared to place a great deal of significance on the lack of mental health treatment notes in the record for the period between the alleged onset of disability and the date Ms. Bennett was last insured. *See* Tr. 8, 11, 12, 30, 67. The Court first notes that this is a relatively short time period, only a little over a year (from January 27, 2010, through March 11, 2011), *id.* 15, and it previously found in Section V.B that the ALJ erred in not developing the record to obtain the treatment records. The Court finds that the ALJ also erred in not considering the evidence in the record documenting Plaintiff's anxiety, agoraphobia and other symptoms that left her unable to leave the home even for medical appointments, as discussed in Section V.A., *supra*. The ALJ made an unsupported inference when she found that the evidence undermined Plaintiff's credibility. *See Langley*, 373 F.3d at 1121 ("[A]n ALJ may not make speculative inferences from medical reports and

may reject a ...[medical provider's] opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation, or lay opinion.*") (internal quotation marks omitted and emphasis in original).

The ALJ made a similar error in finding that Plaintiff was not entirely credible in regard to her description of "fairly limited" daily activities. Tr. 11. The ALJ's decision to discredit Plaintiff's reports of limited daily activities for a lack of "objective verification" is unreasonable in light of the evidence of agoraphobia with related limitations as discussed in this Order, and does not constitute substantial evidence to support the ALJ's findings. Further, while the evidence showed that Plaintiff exercised at home (*id.* at 11, 345-6), this does not in any way impact or allow the ALJ to discount Plaintiff's reports of limitations in other activities and social interactions, particularly given the medical evidence that provides support for the existence of these limitations. Thus, the ALJ's finding that Plaintiff was "actually quite active[,]" due merely to exercise (*id.* at 11), is a selective application of the evidence.[11]

The ALJ is directed on remand to conduct a proper pain analysis and reassess Plaintiff's credibility, making findings that are closely and affirmatively linked to substantial evidence.

**D.    The Step Five Assessment**

Finally, the Court finds that the ALJ erred in not considering Plaintiff's borderline age status. When a claimant is "within a few days to a few months" of the next age category,

---

[11] The ALJ's decision to rely on exercise as a basis to find that Plaintiff was not entirely credible also fails to take into account the fact that Plaintiff was directed by her medical providers to exercise. *See* Tr. 345-46, 910. The Court finds that it unreasonable to infer from the fact that Plaintiff exercises at the direction of her medical providers that Plaintiff is not in pain or as functionally impaired as she alleges.

the Commissioner's regulations indicate that the ALJ should consider the claimant to be of "borderline age," and may consider whether it is appropriate to use the higher age category. 20 C.F.R. § 404.1563(b). Thus, in a borderline situation, the ALJ should not apply the age categories mechanically. *Id.* Here, on the date last insured Plaintiff was less than five months from the advanced age category. Tr. 14. If the ALJ applied the higher advanced age category, Plaintiff would qualify as presumptively disabled under the Grids per the criteria of 20 C.F.R., Part 404, Subpart P. Appendix 2, § 202.06. The Commissioner does not dispute this, but contests Plaintiff's assertion that the ALJ committed error in applying the age category that he did.

The Tenth Circuit considered a similar scenario to this case in *Byers v. Astrue*, 506 F. App'x 788 (10th Cir. 2012). In *Byers*, as here, the claimant was five-and-a-half months from attaining age 55, at which point the Grids would have mandated a finding of disabled. Tr. at 790-91. The *Byers* court stated that it was unclear whether the ALJ "was even aware of the potential borderline situation[,]" and held that a remand was required for the ALJ to consider whether the plaintiff "fell within the borderline or whether he should be considered in the next age bracket." *Id.* While *Byers* noted that the ALJ applied the wrong date in calculating that the plaintiff was closely approaching advanced age, *id.* at 791, which the Commissioner makes much of (*see* Response [#22] at 23-24), this was not the issue requiring remand. Instead, the remand was due to the Tenth Circuit's concern that the ALJ was not aware of and did not consider the potential borderline situation. 506 F. App'x at 791.

Here, although the ALJ was aware of Plaintiff's age (Tr. 13), there was no discussion or consideration of whether a potential borderline situation was presented, as in *Byers*. This was also demonstrated by the ALJ's statement that "Social Security regulations require substantial impairment for individuals under age 55." *Id.* The ALJ thus appears to apply a particularly rigorous standard to Plaintiff, placing her in a category that included younger individuals, although Plaintiff was in the closely approaching advanced age category during the entire time at issue. 20 C.F.R., Part 404, Subpart P. Appendix 2, § 201.00(g). While the Court agrees with the Commissioner that the ALJ need only consider whether the higher age category is appropriate, and is not mandated to apply it, 20 C.F.R. § 404.1563(b), the ALJ erred here in not considering whether to apply the advanced age category. Accordingly, a remand is appropriate on this ground as well.

## VI. Conclusion

For the reasons set forth above, it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further proceedings consistent with this Order pursuant to sentence four in 42 U.S.C. § 405(g).

Dated: January 17, 2020

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge